UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-cv-221-MOC-DSC

| | | | |
|---|---|---|---|
| WENDY MCKINNEY, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| CLEVELAND COUNTY BOARD | ) | ORDER | |
| OF EDUCATION, MARK PATRICK, | ) | | |
| STEPHEN FISHER, JENNIFER | ) | | |
| WAMPLER, | ) | | |
| | ) | | |
| Defendants. | ) | | |
| _____ | ) | | |

   **THIS MATTER** comes before the Court on a Motion for Summary Judgment by

Defendant Cleveland County Board of Education. (Doc. No. 35).

   I.   **BACKGROUND**

   A.   **Procedural Background**

   This is an employment discrimination action brought by Plaintiff Wendy McKinney

against her former employer Cleveland County Schools ("CCS"). Plaintiff filed this action in

Gaston County Superior Court on March 17, 2020, naming the following persons and entities as

Defendants: (1) Cleveland County Schools/Board of Education ("the Board"); (2) Mark Patrick,

individually and in his official capacity as principal of North Shelby School ("NSS"); (3)

Stephen Fisher, in his official capacity as Cleveland County Schools Superintendent; and (4)

Jennifer Wampler, individually and in her official capacity as Assistant Superintendent of

Operational and Human Services, and Executive Director of Human Resources for the Cleveland

County Schools. Defendants removed the case to this Court on April 15, 2020, based on federal

1

question jurisdiction, under 28 U.S.C. § 1331. (Doc. No. 1).

Plaintiff's Amended Complaint alleged the following ten causes of actions under state and federal law: (1) wrongful discharge against the Board under North Carolina law; (2) intentional infliction of emotional distress against the Board and Patrick in his official and individual capacities; (3) negligent infliction of emotional distress against the Board and Patrick in his official and individual capacities; (4) violations of the North Carolina Wage and Hour Act against the Board; (5) unlawful retaliation against the Board under three North Carolina statutes—N.C. GEN. STAT. § 115C-335.5, N.C. GEN. STAT. § 168A-10; and N.C. GEN. STAT. § 126-85; (6) pregnancy discrimination and hostile work environment claims against the Board under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., ("Title VII"); (7) discrimination and failure to provide reasonable accommodations claims against the Board under the American with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.; (8) claims against the Board under the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq.; (9) various federal statutory and U.S. Constitutional claims against all Defendants under 42 U.S.C. § 1983; and (10) punitive damages for any claim that authorizes such damages against all Defendants. (Doc. No. 1-4).

On November 19, 2020, this Court granted Defendants' motion to dismiss all claims except the claims against the Defendant Cleveland County Schools/Board of Education under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act ("ADA"), and the Family Medical Leave Act ("FMLA"). (Doc. No. 24 at 8). On November 19, 2021, Defendant filed the pending summary judgment motion. (Doc. No. 35). Plaintiff has responded to the summary judgment motion. (Doc. No. 37). Furthermore, the Court held a hearing on the motion on January 20, 2022. The Court ordered supplemental briefing by the parties on February 4,

2022. (Doc. No. 45). The parties have submitted their supplemental briefing. (Doc. Nos. 48, 49). This matter is therefore ripe for disposition.

### B. __Factual Background__

### 1. __Statement of Facts__

Defendant hired Plaintiff as a full-time employee in January 2003. In August of 2003, Plaintiff became a media assistant and bus driver for the Cleveland County schools. In July 2013, Plaintiff began working as a data manager at NSS. In 2015, she was promoted to bookkeeper. (Doc. No. 1-4 at ¶¶ 1, 12).

During the 2016-2017 school year, Plaintiff had gastric bypass surgery and was out of work for approximately six weeks. (McKinney Dep., Doc. No. 35-2 at 20).[1] In December 2016, Plaintiff had surgery related to a hernia and was out of work for approximately four weeks. (Id. at 21). Upon her return, she worked half days for a brief period before resuming a full-time schedule. (Id. at 20). Plaintiff requested and was granted FMLA leave for this surgery and her recovery. (McKinney Dep. Ex. 1, Doc. No. 35-3 at 1, 3).

On or about August 5, 2017, the data manager left NSS, and Plaintiff thereafter performed both jobs of bookkeeper and data manager (and helped to cover the receptionist's desk) during the 2017-2018 school year. (Wampler Dep., Doc. No. 35-5, at 41). Plaintiff received only positive employment reviews and evaluations in her various roles from 2003 through 2017. (Id. at 41).

In June 2017, Principal Hodges left North Shelby and was replaced by Mark Patrick. (Doc. No. 35-2 at 24). Plaintiff disagreed with Patrick's policies related to bookkeeping and had

---

[1] Record citations in this Order correlate with how exhibits have been filed on the Court's docket.

3

conflict with Mr. Patrick as her supervisor. (Id. at 27). Plaintiff contacted CCS Assistant Superintendent of Operational and Human Resources Jennifer Wampler about how Patrick allegedly treated Plaintiff at work. This led to a meeting between Ms. Wampler's assistant in the Human Resources Department, Jennifer Walker, and Plaintiff and Patrick on November 27, 2018. (Id. at 27, 32–36).

During the 2017-2018 school year, Plaintiff had many absences from work that were not covered by FMLA. In August, September, and October, Plaintiff missed work on nine occasions for either a full or half day. (Doc. No. 35-2 at 39). In November 2017, Plaintiff was absent for seven days, either full or half days, excluding the day of the meeting between Plaintiff, Patrick, and Walker. (Id. at 39–40).

In February of 2018, Plaintiff's mother became sick with cancer. Plaintiff was approved for leave under the FMLA to take her mother to doctor appointments during the second semester of the 2017-2018 school year. At this time, Plaintiff was instructed to prepare an unofficial spreadsheet of her absences, including the reason(s) why she would be absent, who would be substituting or covering for her during her absence(s), and stating whether the requested time off was covered under FMLA. (Id. at 46–47). According to Plaintiff, other employees were not similarly required to prepare a spreadsheet.

Plaintiff's principal Mark Patrick told Plaintiff he would have to discuss Plaintiff's leave requests with vice principal Nancy Nation. (See Doc. No. 35-3 at 17–19). According to Plaintiff, this was not the usual policy, practice, custom or usage for other employees seeking medical leave, paid time off, or other approved absences. Plaintiff contends that these other employees were allowed to find a substitute or coverage for their job during the needed absence, and they were allowed to enter the requested time-off into the absence system provided by the County.

4

According to Plaintiff, Defendant's records show inconsistent and contradictory reasons recorded for numerous absences and demonstrate a failure on Defendant's part to determine and designate approved FMLA leave, or to develop any written plan for tracking approved intermittent FMLA leave.

On April 4, 2018, Plaintiff found out she was pregnant, and her physician told her that her pregnancy may not be viable. Plaintiff's physician classified the pregnancy as "high-risk" due to Plaintiff's age and health history. Plaintiff reported her dangerous medical condition to Defendant. Throughout April 2018, Plaintiff experienced severe and disabling arm pain. She went to the emergency room, but pain medications could not be administered due to her pregnancy. A neurosurgeon diagnosed Plaintiff with a pinched nerve in her back but could not order x-rays due to Plaintiff's high-risk pregnancy. Acupuncture was attempted, but the debilitating pain continued. Eventually the condition was diagnosed and surgically treated as a ruptured disk ("back condition"). (Doc. No. 1-4, ¶¶ 27, 29).

In May 2018, a neurosurgeon wrote Plaintiff out of work due to the diagnosed back condition and her related inability to use her left arm. The same month, Plaintiff started physical therapy. (Id. ¶ 30). On or about May 21, 2018, Plaintiff applied for FMLA leave because of her serious health condition involving a high-risk pregnancy. Defendant granted Plaintiff's leave request. When Plaintiff dropped off some paperwork at the school, principal Patrick told her she was not allowed on campus while on a leave of absence. According to Plaintiff, this was contrary to Defendant's policy. Plaintiff received limited permission to be on campus.

On May 28, 2018, Plaintiff advised Patrick that she was hoping she could get the doctor to let her come back to work "this week." She still could not use her left hand to type without excruciating pain, but she stated, "I really want to come back to work." In response to Plaintiff's

stated intention to return to work, Patrick told a colleague that he wished he could say "you are out of leave and you are of no use to me coming and sitting in an office crying." (Doc. No. 40-4 at 26). According to Plaintiff, Defendant then devised a plan to terminate Plaintiff for excessive (although approved) absences by means of a Conditional Evaluation process, but which could not be effectuated until Plaintiff ran out of protected FMLA leave. (Doc. No. 40-4 at 26, 28, 30, 32, 32, 34, 36–42, 44, 46, 48, 54, 56, 58, 62, and 66).

As of July 2, 2018, Plaintiff's leave under FMLA was exhausted. (McKinney Dep. Ex. 8 at 1). On June 29, 2018, Plaintiff's neurosurgeon provided Plaintiff with a Fitness for Duty Certification, stating that Plaintiff was able to return to work under restrictions from July 9, 2018, to October 9, 2018. (Doc. No. 37-14). Plaintiff was restricted from lifting more than 10 pounds due to her back condition. (Id.). In June 2018, NSS moved to a new building. Plaintiff worked through the move to help set up the office at the new school while still subject to medical restrictions to lift no more than ten pounds. Despite the known medical restrictions, Plaintiff was instructed to move (and empty) boxes, as well as move and arrange extremely large files in file cabinets that weighed well over ten pounds. (Doc. No. 35-2, p. 55 at 1–9).

On July 19, 2018, Plaintiff signed a "Conditional Evaluation" of her performance in the position of "Bookkeeper" for the 2017-2018 school year. Principal Patrick signed it on July 16, 2018. The Conditional Evaluation stated in pertinent part:

> When an employee's annual evaluation includes two or more "needs improvement" or "unsatisfactory" ratings, and the employee is not recommended for dismissal at that time, the employee should receive a "conditional" evaluation in no later than sixty (60) working days. A "conditional" evaluation may be conducted at any time that an evaluator has concerns about an employee's performance or conduct.
>
> Being placed on a "conditional" evaluation means that the employee's job is in jeopardy and that significant and sustained improvement must be demonstrated

for continued employment. The evaluator is to consider whether to make a recommendation for dismissal following completion of the conditional evaluation, unless more immediate action is warranted.

(Doc. No. 35-3 at 31). The Conditional Evaluation explained in relevant part:

Plaintiff has missed 38.3 days this school year as of 05/29/18. This number is in addition to days covered by FMLA and/or [leave of absence].

Plaintiff's numerous absences had resulted in office duties and management lacking efficiency and effectiveness. It has required other staff members to cover her duties, which has impacted the daily operation of the school.

As a result, Plaintiff's overall performance is being rated as "needing improvement."

(Id. at 34).

Plaintiff objected to the Conditional Evaluation and wrote a factual rebuttal to correct numerous misstatements in the evaluation, challenging its findings and conclusions. According to Plaintiff, Defendant never advised Plaintiff of the absences classified by Defendant as FMLA leave, despite submitting the uniquely required "spreadsheet" on which she denoted the intermittent dates she believed were covered by FMLA.

As a result of the July 2018 evaluation, Defendant placed Plaintiff on probation for 60 days, to be evaluated again on or before September 14, 2018. (Doc. No. 35-3, at 35–39). Defendant did not offer Plaintiff a re-evaluation, nor did Defendant respond to her written objections. Defendant did not give Plaintiff another opportunity to challenge the negative review or Defendant's classification of her absences, including the undisclosed calculations of approved FMLA leave.

Plaintiff requested additional leave for the 2018-2019 school year and although she did not qualify for FMLA leave, Defendant granted Plaintiff an additional 12 weeks of leave because of her long years of service to the district. (McKinney Dep. Ex. 8 at 1; McKinney Dep. Ex. 12 at

7

1). Plaintiff thus took leave sporadically starting in July 2018. (McKinney Dep. Ex. 8 at 1). On or about August 17, 2018, when she was four to five months pregnant, Plaintiff tripped and fell over a rolled-up rug left in the hallway at NSS. Plaintiff was constantly in pain and concerned about her high-risk pregnancy, but she continued to try and be at work even while dealing with these health issues. As a result of her disabilities and pregnancy, Plaintiff's obstetrician had written Plaintiff out of work. Plaintiff submitted her doctor's notice on or about September 5, 2018, when her pain became too severe to continue working. (Doc. No. 1-4 at 15, ¶ 36).

On September 11, 2018, Plaintiff met with Assistant Superintendent Jennifer Wampler. At this meeting, Wampler explained to Plaintiff that because Defendant had granted an additional 12 weeks of discretionary leave to Plaintiff and that she had exhausted all legally entitled leave, the administration would not recommend approving any additional discretionary leave to Plaintiff beyond November 2018. (McKinney Dep. Ex. 8 at 1).

Plaintiff explained that she was trying to manage her high-risk pregnancy, suffering from a ruptured disk in her back, and experiencing a recurrence of related severe carpal tunnel syndrome. Wampler knew that additional leave from work would be required until Plaintiff could deliver her baby in December and then undergo the ruptured disk surgery, which was expected to resolve the residual carpal tunnel symptoms. Wampler told Plaintiff that, due to the FMLA time taken in February for her mother, Plaintiff was technically about 40 hours short of active workdays to qualify for additional FMLA leave. Plaintiff contends that the amount of this alleged shortage is in disputed and elsewhere stated to have been 101 hours. Wampler told Plaintiff that Defendant had agreed to grant Plaintiff as additional 12 weeks of additional unpaid leave because Plaintiff had been with the school system for 15 years. Defendant categorized the leave on its formal records as qualified FMLA leave. (Doc. No. 35-2, p. 57 at lines 4–5; Doc.

No. 35-3 at 9). Wampler told Plaintiff that this leave would run out on some unspecified date in November 2018. Wampler told Plaintiff she would then have no covered maternity leave, which would then subject her to the school system's "excessive absence policy."

Wampler told Plaintiff she should submit a resignation or her employer would begin the dismissal/termination process. Wampler did not discuss Plaintiff's past approved or protected absences nor performance as a factor in the dismissal. Wampler, however, also informed Plaintiff that she could apply for short-term disability ("STD") and directed her assistant to help Plaintiff submit the forms to qualify for STD, which Plaintiff did immediately after the meeting.

Plaintiff's request for short-term disability was approved following the requisite (60-day) qualification period. Defendant classified Plaintiff as being on approved and qualified short-term disability status, with her eligibility extending for one year, from November of 2018, until November of 2019. (Doc. No. 35-3 at 1). On November 7, 2018, Plaintiff spoke again to Wampler about an extension of unpaid leave, as Plaintiff could not receive invasive treatment for her back condition while pregnant. Plaintiff would schedule her back surgeries at the earliest possible dates after the baby was born. Plaintiff told Wampler that she would only need an additional four to six weeks of approved leave (including the winter holidays), depending on the expiration date for her existing approved 12-week absence. See (Doc. No. 40-4 at 75).

Wampler stated that she could not approve any additional, unpaid leave and told Plaintiff that Wampler "would have to recommend dismissal due to her being in continued violation of Board Policy" on "Excessive Absences." Wampler told Plaintiff she could write a letter to Defendant requesting an extended discretionary leave of absence.

On November 15, 2018, Plaintiff submitted her written request to the Board for additional leave due to her high-risk pregnancy and ongoing (short-term) disability, asking the

9

Board for a few weeks of approved, unpaid leave time, so she could recover from the birth of her child and the back/neck surgeries. (Doc. No. 40-4 at 76). Plaintiff requested that she be allowed return to work by January 2, 2019, with no restrictions.

On November 20, 2018, Wampler sent a memorandum to Defendant Cleveland County Schools/Board of Education regarding Plaintiff's request for an unpaid leave of absence. In the memo, Wampler stated, "To my knowledge, the only leave requests that have been submitted and approved by the board in the past, were requested for full, academic year, and the employees were in good standing." (Doc. No. 40-4 at 75). According to Plaintiff, Wampler failed to distinguish the intermittent FMLA leave taken for Plaintiff's mother's cancer treatments from the approved or protected leave resulting from Plaintiff's known high-risk pregnancy, the reported complications from Plaintiff's ruptured disk, her work-related accident and injuries in helping the school move locations over the summer, or the recognition of her existing qualification for and receipt of short-term disability. Wampler characterized Plaintiff's four-to-six-week extension as unauthorized, unreasonable, and out of line with all past requests for leaves of absence without pay that had been approved by the School Board.

On November 26, 2018, Defendant Cleveland County Schools/Board of Education met in closed session and voted to deny the requested extension of Plaintiff's leave of absence through the end of the school year. See (Doc. No. 40-4 at 88). On November 27, 2018, Wampler called Plaintiff to inform her that Defendants had denied her additional request for an unpaid leave of absence due to her medical condition. By letter dated December 11, 2018, Superintendent Fisher informed Plaintiff that her employment was terminated, that the School Board could not approve her request because Plaintiff was out of leave time, and that such approval would contradict the "excessive absence policy." (Doc. No. 40-4 at 88). Board member Danny Lee Blanton testified

in his deposition that the School Board's vote in closed session to terminate Plaintiff's employment was conducted without consideration or discussion of Plaintiff's performance, Board Policy 5250, Policy Code 7510.F, or any other policy regarding excessive or approved absences. (Blanton Dep., Doc. No. 40-2, pp. 29, 35–38). The Board made was also not aware that Plaintiff was on approved short-term disability. (Id., at 73–74; Miller Dep., Doc. No. 40-3, p. 87).

Plaintiff contends that the school district granted other employees extensions of requested leaves of absence beyond the protected or pre-approved leave provided by the district.[2] According to Plaintiff, on one instance, a male principal was given an extension because his wife was having a difficult pregnancy. In another case, a transportation employee was given leave shortly after being hired. Plaintiff argues that another employee was given an extension to start a new business "to see if he would like it" before he resigned. Several other employees were granted leave for medical reasons. Superintendent Fisher publicly stated in the School Board's meeting of December 14, 2018, that all of those employees had paid leave time left to use. According to Plaintiff, this is disputed by Wampler's admission that most employees were given a full year of discretionary leave of absence.

Defendant presented evidence on summary judgment that Plaintiff's absences as a bookkeeper had required others to step in to do Plaintiff's work. Sherry Champion, who is Payroll Specialist in the Payroll Department of CCS, had to assume many of the duties that would have been performed by Plaintiff. (Champion Aff., Doc. No. 35-7 ¶ 10). Champion had to physically travel to North Shelby School in order to obtain the relevant payroll information and it

---

[2] Plaintiff has not included any exhibits or attachments as evidence to support her anecdotal evidence of those employees being granted such leaves of absence.

would often take her more than one entire workday to enter all of the relevant information for payroll. (Id. ¶¶ 11–12). This work was on top of Champion's other regular duties and was a "hardship" on her. (Id. ¶ 15). Michelle Brennan, who was an Accounts Payable/Purchasing Clerk in the Purchasing Department at this time, likewise had to take on the work that would have been done by Plaintiff. (Brennan Aff., Doc. No. 35-8 ¶¶ 8–9). In Plaintiff's absence, Brennan had to travel to the North Shelby School on multiple occasions to pay invoices, prepare monthly credit card statements, order school supplies, receive cash from teachers and write out receipts to the teachers, and review and reconcile North Shelby's bank statements. (Id. ¶¶ 10–14). These tasks were on top of her regular duties for CCS and required "considerable time." (Id. ¶¶ 16–17).

## II.   STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-

12

movant's position is insufficient to withstand the summary judgment motion. <u>Anderson</u>, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. <u>Dash v. Mayweather</u>, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson</u>, 477 U.S. at 248. Further, Rule 56 provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, the non-movant must show the existence of a factual dispute on every essential element of his claim.

### III.   DISCUSSION

### A.  Defendant's Title VII Pregnancy Discrimination Claim

Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In 1978, with the passage of the Pregnancy Discrimination Act ("PDA"), Congress amended the definition section of Title VII to include the following:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k). Under the definition imposed by the PDA, therefore, "an employer is obliged to ignore a woman's pregnancy and 'to treat the employee as well as it would have if she were not pregnant.'" Urbano v. Continental Airlines, Inc., 138 F.3d 204, 206 (5th Cir. 1998) (quoting Piraino v. Int'l Orientation Resources, Inc., 84 F.3d 270, 274 (7th Cir. 1996)). The PDA does not require an employer to extend benefits to pregnant women that it does not also extend to other employees, including taking excessive work absences. See Armindo v. Padlocker, Inc., 209 F.3d 1319, 1322 (11th Cir. 2000) (holding that the "PDA is not violated by an employer who fires a pregnant employee for excessive absences, unless the employer overlooks the comparable absences of non-pregnant employees").

The PDA does not require an employer to provide special accommodations to its pregnant employees. The PDA only ensures that pregnant employees are given the same opportunities and benefits as nonpregnant employees who are similarly limited in their ability to work. See Spivey v. Beverly Enters., Inc., 196 F.3d 1309, 1312 (11th Cir. 1999); see also Byrd v. Lakeshore Hosp., 30 F.3d 1380, 1382 (11th Cir. 1994) ("It is today a settled principle that the PDA and Title VII are violated when pregnant employees are denied privileges afforded non-pregnant temporarily disabled employees."). And if an employee's pregnancy prevents her from fulfilling the duties of her position, her employer is not obligated to treat her any differently than it would treat a nonpregnant employee who is in the same position. See Armindo v. Padlocker, Inc., 209 F.3d 1319, 1320 (11th Cir. 2000) ("[T]he Pregnancy Discrimination Act ... is not

14

violated by an employer who fires an employee for excessive absences, even if those absences were the result of the pregnancy, unless the employer overlooks the comparable absences of non-pregnant employees."); see also Geier v. Medtronic, Inc., 99 F.3d 238, 242 (7th Cir. 1996) ("[T]he Pregnancy Discrimination Act does not require that employers make accommodations for their pregnant workers; 'employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees.'" (quoting Troupe v. May Dep't Stores Co., 20 F.3d 734, 738 (7th Cir. 1994)) (alterations omitted)).

Under Title VII, a plaintiff has two paths to demonstrate employment discrimination: (1) the mixed-motive framework or (2) the pretext framework first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Haynes v. Waste Connections, Inc., 922 F.3d 219, 223 (4th Cir. 2019). To survive summary judgment under the mixed-motive framework, a plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Rhoads v. F.D.I.C., 257 F.3d 373, 391 (4th Cir. 2001) (internal quotation omitted). That is, "[w]hat is required is evidence of conduct or statements that both reflect directly the allegedly discriminatory attitude and that bear directly on the contested employment action." Id. at 391–92 (internal quotation omitted).

Plaintiff alleges discrimination under Title VII on the basis "of her pregnancy or related medical conditions." However, there is no direct or indirect evidence of any discriminatory attitude that bears on the contested employment action; thus, Plaintiff's only available avenue is the burden-shifting approach of McDonnell Douglas. Haynes, 922 F.3d at 223.

To make out a prima facie case of employment discrimination related to pregnancy under Title VII, Plaintiff can only proceed "by showing that (1) [s]he is a member of a protected class;

15

(2) [s]he suffered [an] adverse employment action; (3) [s]he was performing h[er] job duties at a level that met h[er] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." Holland v. Wash. Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007); see also Haynes, 922 F.3d at 223.

Under the McDonnell Douglas burden-shifting framework, the initial burden is on the plaintiff to demonstrate each of these four elements; thus, she must show that she had satisfactory job performance in the eyes of her employer. This element "does not require the plaintiff to show that [s]he was a perfect or model employee. Rather, a plaintiff must show only that [s]he . . . was meeting [her] employer's legitimate expectations." Hayes v. Waste Connections, Inc., 922 F.3d 219, 225 (4th Cir. 2019). However, a plaintiff must show that she is meeting the legitimate job expectations of her employer; thus, neither a plaintiff's nor a coworkers' testimony can create a genuine issue of material fact on that point: "'It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960–61 (4th Cir. 1996)).

On summary judgment, Defendant has presented evidence that Plaintiff was not meeting Defendant's legitimate performance expectations before she was fired. In the summer of 2018, before Plaintiff's termination in December 2018, Plaintiff received a "conditional" evaluation from her supervisor, Principal Mark Patrick, and her overall performance was rated "as 'needing improvement.'" (McKinney Dep. Ex. 6, at 4). This conditional evaluation stated on its face that "the employee's job is in jeopardy." (McKinney Dep. Ex. 6, at 1). The evaluation set out that Plaintiff had missed 38.3 days of school over and above absences that were covered by the

16

Family and Medical Leave Act or any leave of absence. (McKinney Dep. Ex. 6, at 4). The evaluation stated that Plaintiff's "numerous absences have resulted in office duties and management lacking efficiency and effectiveness." (Id.). The evaluation made clear that a "needs improvement" rating meant that the "employee is not recommended for dismissal at [this] time," but the evaluation was a "conditional evaluation," which was defined as one where "the employee's job is in jeopardy." (McKinney Dep. Ex. 6, at 1). The evaluation set out that "significant and sustained improvement must be demonstrated for continued employment." (Id.).

The evaluation was signed by Principal Patrick on July 16, 2018, and by Plaintiff on July 19, 2018. Despite this conditional evaluation based upon her "numerous absences" and the need for "significant and sustained improvement," by December 1, 2018, which was part of the academic year which started on July 1, Plaintiff had missed over 70 full days of work and 15 partial days. (McKinney Dep. Ex. 12, at 1). Given the lack of sustained improvement, Superintendent Fisher sent Plaintiff a letter on December 14, 2018, notifying Plaintiff of her termination. (Id.). Here, because Plaintiff has not shown that she was meeting Defendant's legitimate expectations—that is, she had numerous, unexcused absences—she has not made out a prima facie case under Title VII. See Randa v. Garland, 855 F. Appx. 874 (4th Cir. 2021) (per curiam) (holding that even though former AUSA had received a positive performance evaluation, her termination did not constitute discrimination under Title VII because she failed to satisfy the third element, because her supervising attorney had concluded that plaintiff was not a competent employee).

Plaintiff argues in her response that there are genuine issues of material fact for her Title VII claim because (1) there is "direct or probative indirect evidence of a 'mixed-motive discrimination'" and (2) because there is a genuine issue of material fact surrounding the

17

"conditional evaluation" she received for the 2017-2018 school year. Plaintiff's contentions fail.

As the mixed-motive framework under Title VII, a plaintiff "may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that sex . . . discrimination motivated the employer's adverse employment decision." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004), overruled in part on other grounds, Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). Plaintiff claims that the mere fact that Defendant knew she was pregnant provides such evidence. While knowledge of a pregnancy can satisfy the first element under the McDonnell Douglas burden shifting regime, Simpson v. Amylin Pharms., Inc., 977 F. Supp. 2d 552, 563 n.7 (W.D.N.C. 2013), it is not enough under the mixed-motive framework: "At a minimum, to pursue an mixed-motive case, a plaintiff must demonstrate that a protected trait . . . actually played a role in the employer's decision-making process and had a determinative influence on the outcome." Worden v. SunTrust Banks, Inc., 549 F.3d 334, 342 n.7 (2008) (emphasis added) (internal quotation omitted). Mere knowledge of the existence of Plaintiff's pregnancy, without more, which is all that Plaintiff puts forward in opposition to summary judgment, does not establish direct or circumstantial evidence that Plaintiff's pregnancy "actually played a role in the employer's decision-making process and had a determinative influence on the outcome."

Next, as to Plaintiff's argument under the McDonnell Douglas burden shifting approach, Plaintiff's asserts that the fact that she disagreed with the negative work evaluation and filed a written objection to the evaluation "confirms the existence of a genuine issue of fact." (Doc. No. 40 at 17). It is well settled, however, that an employee's disagreement with a job evaluation does not create an issue of material fact and that it is the employer's perception that matters under Title VII: "It is the 'perception of the decision maker which is relevant, not the self-assessment

18

of the plaintiff.'" Fry v. Rand Constr. Corp., 964 F.3d 239, 248 (4th. Cir. 2020), cert. denied, 141 S. Ct. 2595 (2021) (quoting DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998)). In any event, the negative work evaluation stressed that the poor evaluation was based on Plaintiff's excessive absences. While Plaintiff disagreed with the negative work evaluation generally, Plaintiff does not contest and has admitted that she in fact did have excessive absences.

Given that one of the four requirements to make out a prima facie case under the Title VII burden shifting framework is that the employee must be performing her "job duties at a level that met h[er] employer's legitimate expectations at the time of the adverse employment action," Holland v. Wash. Homes Inc., 487 F.3d 208, 214 (4th Cir. 2007), Plaintiff's argument that her "conditional evaluation cannot properly be considered as a determinative factor in Plaintiff's prima facie case" is incorrect as a matter of law. "[T]he plaintiff's perception of [her]self . . . is not relevant. Similarly, that plaintiff's coworkers may have thought that [she] did a good job, or that [she] did not 'deserve' [to be discharged], is close to irrelevant." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998).

Plaintiff also argues that her conditional evaluation, which was primarily the work of the principal of the school where she worked, does not satisfy Title VII's requirements because the principal was not the employer or decision-maker. This argument is incorrect as a matter of law. As the Supreme Court has held, "[A] tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 762 (1998). Under North Carolina law, "the executive head of a school shall be called 'principal.'" N.C. GEN. STAT. § 115C-5(7). The statutes also set out that "[e]very principal of a public school shall make such reports as are required by the boards of education . . . ." N.C. GEN. STAT. § 115C-288(b). The North Carolina courts have echoed this language: "By statute and

19

under traditional common-law principles, then, the superintendent and principal are agents of the board." Trivette v. Yount, 735 S.E.2d 306, 309 (N.C. 2012) (quoting Abell v. Nash Cnty. Bd. of Educ., 643 S.E.2d 566, 570 (N.C. Ct. App. 2007)). The school principal's job evaluation of Plaintiff was the act of Defendant under Title VII.

In sum, the fact that Plaintiff's employer gave her a conditional evaluation in July 2018 defeats Plaintiff's ability to maintain a prima facie case under Title VII because she was not working at a level that met her employer's legitimate job expectations. According to Plaintiff's 2018 conditional evaluation, her most recent job performance evaluation, her job was in jeopardy and "significant and sustained" improvement was necessary for her to keep it. Because Plaintiff cannot maintain a prima facie case of her Title VII claim based on pregnancy discrimination, Defendant is entitled to summary judgment as to this claim.

### B. Plaintiff's ADA Discrimination Claim

Under the ADA, employers are prohibited from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A "qualified individual" is "'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position.'" Wilson v. Dollar General Corp., 717 F.3d 337, 345 (4th Cir. 2013) (quoting 42 U.S.C. § 12111(8)). Defendant contends that Plaintiff's claims under the ADA for discrimination and lack of reasonable accommodation cannot proceed because she cannot show that she is a "qualified individual" under the Act. Laird v. Fairfax Cnty., Va., 978 F.3d 887, 892 n.4 (4th Cir. 2020). For the following reasons, the Court agrees.

In Plaintiff's response to the summary judgment motion, Plaintiff argues that she made a request for reasonable accommodations under the ADA which "was adequate, and clearly put the employer on notice." (Doc. No. 40 at 19). However, as Defendant correctly points out,

20

reasonable accommodations need only be made if a person is a "qualified individual" to begin with. A qualified individual is someone who can perform the essential functions of the job. Johnson v. Bd. of Trustees of Boundary Cnty. Sch. Dist. No. 101, 666 F.3d 561, 565 (9th Cir. 2011); accord Sieberns v. Wal-Mart Stores, Inc., 125 F.3d 1019, 1022 (4th Cir. 1997).

One of the most basic requirements for an employee is attendance: "An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." Tyndall v. Nat'l Educ. Ctrs., Inc. of Calif., 31 F.3d 209, 213 (4th Cir. 1994). "In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. . . . Therefore, a regular and reliable level of attendance is a necessary element of most jobs." Id. Employers possess the ability to establish the requisite essential functions of jobs for their employees and "they do not need to change a job's essential functions or split them across multiple employees," nor do they need to "require other employees to work harder or longer." Elledge v. Lowe's Home Cntrs., LLC, 979 F.3d 1004, 1013 (4th Cir. 2020) (internal quotation omitted). "An accommodation is reasonable 'unless [the employer] can demonstrate that the accommodation would impose an undue burden.'" Lamb v. Qualex, Inc., 33 Fed. Appx. 49, 59 (4th Cir. 2002) (quoting 42 U.S.C. § 12112(b)(5)(A)).

While the Fourth Circuit has held that regular and reliable attendance is usually an essential function of the job, "[e]ven if a person is unable to perform the essential function of the job in question, a court must nevertheless determine whether the person could do the job with reasonable accommodation." Martinson v. Kinney Shoe Corp., 104 F.3d 683, 687 (4th Cir. 1997) (internal quotation omitted). However, the Fourth Circuit has also held that this requirement does not encompass "an individual's future ability to perform the essential functions of [her]

21

position." Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995) (emphasis added). Rather, the ADA provisions "are formulated entirely in the present tense, framing the precise issue as whether an individual 'can' (not 'will be able to') perform the job with reasonable accommodation. Nothing in the text of the reasonable accommodation provision requires an employer to wait an indefinite period for an accommodation to achieve its intended effect." Id.

Here, the evidence shows on summary judgment that Plaintiff was excessively absent from her job during the 2017-2018 school year as reflected in her conditional job evaluation, had been granted the full measure of leave to which she was entitled under the FMLA by July 2, 2018, and was then granted an additional 12 weeks of unpaid leave by Defendant that was not required under any statute and which ended in November 2018. Plaintiff asserts that she informed her employer that she could come back to work full time in January 2019, after she had her baby and recovered. When the 12 weeks of unpaid leave were about to expire, Plaintiff wrote to Defendant Board: "I need six weeks from the birth of my son and two weeks from my neck surgery to recover." (McKinney Dep. Ex. 11 at 1). Plaintiff necessarily qualified the request, however, with the caveat "[a]s long as there is [sic] no complications from the childbirth and neck surgery." (Id. at 1). About two weeks before the request to the Defendant board, Plaintiff stated in an email to her school principal and Defendant board's assistant superintendent that she had another health issue. Plaintiff wrote: "I was sent to an orthopedic surgeon where I found out I now also have a severe case of carpal tunnel. My left hand is completely crippled now and has formed into a claw that I can only straighten with force and I have no feeling in either hand." (McKinney Dep. Ex. 10 at 1).

Here, Plaintiff's stated intentions to return to work sometime in the future after her prolonged absence does not raise a genuine issue of fact as to whether she could perform the

22

essential duties of her position. Plaintiff has simply not shown that she could fulfill the essential functions of her position at the time she was terminated. While Defendant could have been more generous than the law requires and given Plaintiff even more time to return to work, including until after she had her baby and recovered from her physical ailments, Defendant's failure to do so simply does not constitute a violation of the ADA.

In sum, given that Plaintiff cannot meet her burden of demonstrating that she "could do the job with reasonable accommodation," Martinson, 104 F.3d at 687, and given her extended absences from her job, Plaintiff has failed to raise a genuine issue of disputed fact as to whether she could perform the essential functions of her position for her reasonable accommodation claim. Thus, Defendant is entitled to summary judgment as to Plaintiff's ADA claim.

### C.  Plaintiff's FMLA Claim

The FMLA "entitles eligible employees to take twelve weeks of leave during any twelve-month period" for serious health problems of family members or themselves. Vannoy v. Fed. Reserve Bank of Richmond, 827 F.3d 296, 301 (4th Cir. 2016). Because FMLA is not unlimited, the "FMLA requires that employers provide an individual, written notice to affected employees that an absence qualifies under the FMLA." Id. (citing 29 C.F.R. § 825.300). Plaintiff alleged in the Amended Complaint that she was terminated in violation of the FMLA because she "compl[ied] with her doctor's note" and "for taking time off that would have been covered under the FMLA." (Doc. No. 1-4 ¶ 65).

On summary judgment, Plaintiff has presented no evidence that she was terminated for taking FMLA leave or that Plaintiff was not granted the full amount of FMLA leave to which she was entitled. Here, the undisputed evidence shows that by July 2018 Plaintiff had exhausted her FMLA leave. Then, in July 2018 Plaintiff requested and was granted an extra 12 weeks of

23

discretionary leave. Defendant was not required by any law to give her this extra leave, but it did so because of Plaintiff's many years of service to the school district. Plaintiff then was partially absent from her bookkeeping job from July 2018 to September 2018. She was completely absent from her bookkeeping job from September 2018 until her termination in December 2018. Between July 2, 2018, when she had exhausted her FMLA leave, and when Defendant terminated her employment, Plaintiff had 70 full days and 15 partial days of absences. Defendant had presented ample evidence on summary judgment that it terminated Plaintiff's employment because of her many absences, not because she took FMLA leave.

In response to Defendant's summary judgment motion, Plaintiff contends that she received no written notice of her FMLA absences. Plaintiff asserts that she was required to chart her own absences and designate whether the leave was FMLA or otherwise. She further contends that Defendant failed to properly determine, document, or inform Plaintiff of her FMLA rights, and in the Condition Evaluation and the Board's policy on Excessive Absences, discriminated against her for taking FMLA and punished her for having exercised their rights under federal law.

To the extent that Plaintiff is now alleging a violation as to lack of written notice under the FMLA, Plaintiff has presented no evidence to show that she was prejudiced by any such violation. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 90 (2002) (noting that a plaintiff must show a "real impairment of [her] rights and resulting prejudice"). Here, Plaintiff was informed in a meeting on September 11, 2018, with Defendant board's assistant superintendent that she had exhausted her FMLA leave and that, because of her other absences, she did not qualify to any additional leave under the FMLA. While Plaintiff contends that it was Defendant's responsibility to keep track of and inform her of her FMLA leave rights, she neither

24

argues nor presents any evidence that she was denied any FMLA leave to which she was entitled. Moreover, as noted, she has not raised a genuine issue of a disputed fact as to whether Defendant terminated her employment for taking FMLA leave, particularly given that Plaintiff was granted 12 weeks of additional leave that she was not entitled to under any law. In sum, the Court finds that Defendant is entitled to summary judgment as to Plaintiff's FMLA claim.

## IV.     CONCLUSION

For the reasons stated herein, the Court grants Defendant's summary judgment motion.

Finally, the Court writes separately to note that Plaintiff, a long-time and otherwise well-qualified employee of the Cleveland County school district, no doubt faced immense personal and physical challenges that kept her out of work for long periods of time before she was fired. She took care of her mother, who had cancer, and then she was faced with a difficult, high-risk pregnancy and other medical conditions that resulted in many work absences. Arguably, considering the many years of dedicated service Plaintiff gave to the Cleveland County school district, the school district should have allowed her to take the rest of the 2018 calendar year off and recover to full health, before requiring her to return to work in January 2019 after the school's Christmas break. Aside from the right to take 12 weeks of unpaid FMLA leave and an employer's sheer generosity, American workers have few options when they face a personal health crisis that forces them out of work for long periods. This is unfortunate and can result in especially cruel consequences for employees who have loyally served an employer for decades. In this case, however, the Court is constrained to find that there are no genuine issues of disputed fact as to whether Plaintiff's ADA, FMLA, or Title VII rights were violated. Here, the undisputed evidence shows that Defendant did not terminate Plaintiff's employment because of her pregnancy, because of an ADA disability, or because she took FMLA leave. Rather, the

25

evidence shows that Defendant terminated Plaintiff's employment because of her excessive absences. Therefore, Defendant is entitled to summary judgment on Plaintiff's Title VII, ADA, and FMLA claims.

**IT IS, THEREFORE, ORDERED** that:

1.  Defendant's Motion for Summary Judgment, (Doc. No. 35), is **GRANTED**, and this action is dismissed with prejudice.

Signed: March 25, 2022

Max O. Cogburn Jr.
United States District Judge